IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Robert Martin, | ) | C/A No.: 1:16-1562-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

A.      Procedural History

On April 2, 2012, Plaintiff filed an application for DIB in which he alleged his disability began on July 21, 2009. Tr. at 161–62. His application was denied initially and upon reconsideration. Tr. at 118–21 and 126–27. On July 28, 2014, Plaintiff had a

hearing before Administrative Law Judge ("ALJ") Colin Fritz. Tr. at 29–88 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 30, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–28. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 16, 2016. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 48 years old at the time of the hearing. Tr. at 34. He completed high school and obtained an industrial maintenance certification. Tr. at 36. His past relevant work ("PRW") was as a die cutter helper, an industrial cleaner, an ingredient handler, and a landscape laborer. Tr. at 63–64. He alleges he has been unable to work since January 12, 2012.[1] Tr. at 34.

2.    Medical History

Plaintiff presented to Heather Esquivel, M.D. ("Dr. Esquivel"), with complaints of allergies, anxiety, and back pain on May 2, 2011. Tr. at 274–76. He reported that his stress had increased as a result of family issues and unemployment. Tr. at 274. He indicated he had been "really ill with everyone" and was experiencing occasional panic symptoms. *Id.* Dr. Esquivel described Plaintiff as pleasant and in no apparent distress. *Id.*

---

[1] Plaintiff amended his alleged onset date from July 21, 2009, to January 12, 2012, during the hearing. Tr. at 34–35.

2

She observed Plaintiff to have good attention to hygiene and body habitus and to communicate well. *Id.* Plaintiff demonstrated full and symmetric muscle strength and normal muscle tone. Tr. at 275. Dr. Esquivel observed Plaintiff to be tender to palpation over his bilateral sacroiliac joints and the paraspinous muscles in his lumbosacral spine. *Id.* A straight-leg raising test was negative and a psychiatric examination was normal. *Id.* Dr. Esquivel's impressions were generalized anxiety disorder, lumbago, and allergic rhinitis. *Id.* She prescribed nonsteroidal anti-inflammatory drugs ("NSAIDS"), a muscle relaxer, and Tramadol for chronic low back pain and gave Plaintiff a handout on back exercises. *Id.* She prescribed Paxil for anxiety and recommended Plaintiff see a counselor. *Id.*

On June 30, 2011, Plaintiff reported that his back pain was manageable with Tramadol and Flexeril and that he was doing back exercises at home. Tr. at 277. He indicated he had stopped taking Paxil after two days because it made him feel paranoid. *Id.* He stated he was engaging in some volunteer work and was feeling better and less anxious because he was filling his days with activity and working toward getting a job. *Id.* Dr. Esquivel observed Plaintiff to be tender to palpation over his bilateral sacroiliac joints and paraspinous muscles in his lumbosacral spine, but noted no other abnormalities. Tr. at 278. She refilled Plaintiff's other medications, but discontinued Paxil because Plaintiff denied mental health problems. *Id.*

Plaintiff followed up with Dr. Esquivel for medication refills on September 29, 2011. Tr. at 280. He reported that his back pain was manageable with his medication, but indicated he had run out of it a month earlier. *Id.* A physical examination was positive for

3

tenderness to palpation in Plaintiff's bilateral sacroiliac joints and lumbosacral paraspinous muscles, but was otherwise normal. Tr. at 280–81. Dr. Esquivel refilled Plaintiff's medications. Tr. at 281.

On January 12, 2012, Plaintiff complained that his back pain was worsening because he was caring for his elderly parents and helping them to transfer. Tr. at 283. He reported that Flexeril provided some relief, but caused him to feel drowsy. *Id.* He stated he was taking eight to 10 Tramadol pills per day. *Id.* Dr. Esquivel observed that Plaintiff had full and symmetric muscle strength and normal muscle tone, without atrophy or abnormal movements. Tr. at 284. She noted positive tenderness to palpation over Plaintiff's bilateral sacroiliac joints and lumbosacral paraspinous muscles. *Id.* She continued Plaintiff's medications, discussed possible injections, and referred Plaintiff to pain management. *Id.*

Plaintiff presented to Dwight A. Jacobus ("Dr. Jacobus"), at Pain Management Associates for an initial evaluation on February 8, 2012. Tr. at 288. He reported back pain and left lower extremity discomfort. *Id.* He endorsed a history of multiple automobile and motorcycle accidents, but stated his pain had worsened since he had been acting as a caregiver for his parents over the past several months. *Id.* He indicated his pain was exacerbated by walking on unleveled grass and gravel, climbing stairs and inclines, getting up and down, and engaging in repetitive activities. *Id.* Dr. Jacobus observed Plaintiff to move around the office satisfactorily and to have good range of motion ("ROM") of his cervical spine. Tr. at 289. He indicated Plaintiff's back exam was normal and that his posterior thorax was symmetrical. *Id.* He observed Plaintiff to have

4

some objective myospasm on the left and to have forward flexion to about 80 degrees with pain along the left lateral thigh and into the left foot. *Id.* He noted right and left side bending were at 10 degrees with pain and back pending was at five degrees. *Id.* Plaintiff demonstrated normal reflexes and intact pulses. Tr. at 290. Dr. Jacobus observed that extensor halluces motion was intact, but Plaintiff described pain into his left foot. *Id.* He noted that Plaintiff had some paresthesias via pinwheel method along the left L5 dermatome border. *Id.* Plaintiff reported subjective discomfort as he reached 170 degrees of extension on the seated Lasegue's test. *Id.* He complained of discomfort on the left side at 60 degrees in the supine position during the straight-leg raising test. *Id.* Bragard's, Faber, and Patrick's tests were intact. *Id.* Ober's test was negative. *Id.* A femoral nerve stretch test was negative in the prone position. *Id.* Plaintiff had no gluteal atrophy. *Id.* Dr. Jacobus reviewed Plaintiff's x-rays and interpreted them to show osteophytic changes and degenerative osteoarthritis with increased sclerosis, especially at L4-5. *Id.* He assessed lumbosacral myositis, L5 radiculopathy on the left, and degenerative arthritis of the lumbar spine. *Id.* He referred Plaintiff for magnetic resonance imaging ("MRI") and electromyography ("EMG"); had Plaintiff sign a pain contract; prescribed Lortab and Ultram; and discontinued Flexeril. *Id.*

On March 8, 2012, Plaintiff rated his pain as a 10 out of 10 without medication and a six out of 10 with medication. Tr. at 293. He denied side effects from his medications, but continued to report pain that he described as sharp, shooting, stabbing, aching, and burning. *Id.* Dr. Jacobus observed Plaintiff to be tender to palpation

throughout his lumbar area. Tr. at 294. He refilled Plaintiff's prescriptions for Lortab and Ultram and rescheduled his MRI. Tr. at 295 and 297.

On May 8, 2012, electrodiagnostic testing showed evidence of left L5 radiculopathy and possible, but not conclusive evidence of a right S1 radiculopathy. Tr. at 309.

Plaintiff presented to Julie Moss, FNP-C ("Ms. Moss"), for refills of Flexeril and Tramadol on May 9, 2012. Tr. at 285. He reported his pain was controlled. *Id.* Ms. Moss observed Plaintiff to have normal gait and station and an unremarkable inspection and palpation of bones, joints, and muscles. *Id.*

On June 6, 2012, Dr. Jacobus interpreted the MRI of Plaintiff's lumbar spine to show an extruded paracentral left L4-5 disc herniation within the left L5 lateral recess that compressed the L5 nerve root. Tr. at 323. He stated it also indicated central canal stenosis at L3-4 and L4-5, as well as a right foraminal annular tear at L3-4, without focal disc herniation. *Id.* Dr. Jacobus noted that Plaintiff may be a candidate for surgical decompression and laminectomy, but that he desired to pursue other options before scheduling surgery. Tr. at 324. He referred Plaintiff to Robert S. Westrol, M.D. ("Dr. Westrol"), for a consultation and possible injections. *Id.*

Plaintiff presented to Dr. Westrol on June 26, 2012. Tr. at 325. Dr. Westrol observed Plaintiff to have normal left lower extremity strength, tone, and bulk and normal gait without the use of mobility aids. Tr. at 326. He indicated exaggerated lumbar flexion was painful and that Plaintiff had generalized tenderness to palpation throughout

the lumbar area. *Id.* He prescribed Neurontin and scheduled Plaintiff for transforaminal epidural steroid injections ("ESIs") at L4 and L5. Tr. at 327.

Plaintiff presented to W. Russell Rowland, M.D. ("Dr. Rowland"), for a disability evaluation on July 9, 2012. Tr. at 314–19. He complained of severe low back pain, arthritis, and depression. Tr. at 314. He reported a two-year history of lower back pain and indicated he had been involved in seven motor vehicle accidents in the past. *Id.* He stated he had been a heavy drinker, but had stopped drinking in 2000. *Id.* He described his pain as constant and rated it as an eight out of ten on average. *Id.* He indicated he could walk for exercise twice a week for 20 minutes at a time; could push a cart through the grocery store for 30 to 60 minutes once a week; could stand for one hour; could sit for 20 minutes; and could mow grass with a riding mower for two-and-a-half hour per week. Tr. at 314 and 315. He stated his pain was worsened by prolonged sitting and bending. Tr. at 314. He reported pain, occasional swelling, and morning stiffness in his fingers; numbness in his feet; numbness and tremor in his hands; and depression. Tr. at 314–15. Dr. Rowland noted the following objective findings on physical examination: normal gait and station; some mild prominence of the second and third metacarpal phalangeal and proximal interphalangeal joints, without tenderness, synovitis, heat, or redness; normal ROM in the shoulders, elbows, wrists, thumbs, and fingers; 5/5 upper extremity strength; 5/5 upper extremity grip strength; 5/5 lower extremity strength; normal squatting; no crepitus, tenderness, joint effusion, or bony enlargement in the knees; loss of lumbar lordotic curve; normal cervical spine ROM; reduced ROM of the lumbar spine with lumbar flexion reduced to 45 degrees, lumbar extension reduced to 10 degrees, left lateral

flexion reduced to 15 degrees, and right lateral flexion reduced to 20 degrees[2]; negative sitting and supine straight-leg raising test to 60 degrees; normal deep tendon reflexes; intact cranial nerves; no tremor; no impairment to fine dexterity, rapid alternative movements, heel walking, toe walking, tandem gait, and finger-to-nose testing; negative Romberg test; normal sensory examination in bilateral upper extremities and right lower extremity; and mild decreased pinprick sensation of the left foot dorsally over the fifth metatarsal and on the plantar surface. Tr. at 316–17. X-rays of Plaintiff's lumbar spine showed multilevel degenerative disc disease with advanced changes at L3-4 and L4-5, questionable bony spinal encroachment at L5-S1, and loss of the lordotic curvature. Tr. at 313. Dr. Rowland assessed chronic low back pain with pain in the left posterior thigh to the knee and some mild sensory loss in the left foot; mild osteoarthritis of the fingers; chronic cigarette abuse; and situational pain and depression as a result of pain and unemployment. Tr. at 317.

Plaintiff presented to Todd Morton, Ph. D. ("Dr. Morton"), for a mental status evaluation on July 24, 2012. Tr. at 320–22. Dr. Morton observed Plaintiff to be casually dressed, adequately groomed, fully oriented, and alert. Tr. at 320. He indicated Plaintiff was able to speak in a clear and organized manner; had intact short- and long-term memory; was able to recall three of three items after 10 minutes; and was able to complete serial threes. *Id.* He described Plaintiff's mood as neutral to depressed, but indicated he displayed a normal range of affect. *Id.* He estimated Plaintiff's intelligence

---

[2] The ROM chart for orthopedic examination indicates that normal lumbar flexion is to 90 degrees, normal lumbar extension is to 25 degrees, and normal lateral flexion is to 25 degrees bilaterally. Tr. at 318.

to be in the average range. *Id.* Plaintiff denied taking psychotropic medications. *Id.* He endorsed significant signs of depression as a result of not being able to provide for his family and complete chores. *Id.* He reported staying in bed all day and night; being short-tempered and irritable; crying frequently; and feeling helpless and worthless. *Id.* He denied suicidal ideation and attempt. *Id.* He reported feeling anxious in social settings with too many people around. *Id.* Dr. Morton stated it did not appear that Plaintiff had participated in significant mental health treatment, and therefore, it was unknown how well he would respond to treatment. Tr. at 321–22. He indicated that "[g]iven his current level of functioning he would have difficulty maintaining a pace of work that would be required due to his low energy from being depressed." Tr. at 322. He further stated that Plaintiff would "likely have poor relationships with coworkers of [sic] the public due to his irritability and emotional volatility." *Id.* He indicated there were no signs of malingering or significant exaggeration of symptoms and that Plaintiff would likely be able to manage his own funds. *Id.* He assessed major depressive disorder and a global assessment of functioning ("GAF")[3] score of 59.[4] *Id.*

---

[3] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[4] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR*.

On August 2, 2012, Plaintiff complained of a lot of myospasm in his lumbar region. Tr. at 328. Dr. Jacobus confirmed the myospasm on examination, but observed that Plaintiff had good motion, was able to walk on his tiptoes and heels, and had normal and equal reflexes. *Id.* He discussed the scheduled injections and refilled Plaintiff's medications. *Id.*

Dr. Westrol administered lumbosacral transforaminal ESIs at Plaintiff's bilateral L5 level on August 21, 2012. Tr. at 330.

On September 5, 2012, state agency consultant Anna P. Williams, Ph. D. ("Dr. Williams"), reviewed the record and completed a psychiatric review technique form ("PRTF"). Tr. at 94–95. She considered Listing 12.04 for affective disorders and found that Plaintiff had no restriction of activities of daily living ("ADLs"); moderate difficulties in maintaining social functioning and concentration, persistence, or pace; and no episodes of decompensation that were of an extended duration. Tr. at 94. She determined that the evidence did not establish the presence of the paragraph C criteria under the Listing. *Id.* Dr. Williams also completed a mental residual functional capacity ("RFC") assessment. Tr. at 97–99. She determined that Plaintiff had the following moderately limited abilities: to carry out detailed instructions; to maintain attention and concentration for extended periods; and to interact appropriately with the general public. *Id.* Xanthia Harkness, Ph. D. ("Dr. Harkness"), assessed the same level of impairment and limitations on a PRTF and mental RFC on February 22, 2013. Tr. at 109–10.

On September 11, 2012, state agency physician Ted Roper, M.D. ("Dr. Roper"), reviewed the record and assessed Plaintiff's physical RFC as follows: occasionally lift

and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently climbing ramps/stairs, balancing, stooping, kneeling, and crouching; occasionally climbing ladders/ropes/scaffolds and crawling; and must avoid concentrated exposure to hazards. Tr. at 95–97. Seham El-Ibiary, M.D. ("Dr. El-Ibiary"), assessed the same physical RFC on February 13, 2013. Tr. at 110–12.

On October 3, 2012, Dr. Jacobus indicated Plaintiff had violated office policy by failing to bring his medication bottles to the appointment. Tr. at 331. Plaintiff reported having less discomfort, but Dr. Jacobus noted positive myospasm. *Id.* He observed Plaintiff to have intact reflexes and extensor halluces activity and maintained function. *Id.*

On October 25, 2012, Plaintiff reported increased pain to Dr. Esquivel. Tr. at 336. He stated that he planned to request a surgical referral from Dr. Jacobus. *Id.* Dr. Esquivel referred Plaintiff for some blood work; refilled Flexeril, Meloxicam, and Tramadol; and prescribed Nystatin cream for cutaneous candidiasis. Tr. at 337. She recommended that Plaintiff discuss with Dr. Jacobus whether use of Tramdol and Flexeril was appropriate since he was also taking Lortab and Neurontin. *Id.*

On November 1, 2012, Dr. Jacobus noted that he had instructed Plaintiff to try some Williams' flexion exercises and that Plaintiff's activity levels had improved. Tr. at 334. He indicated Plaintiff continued to be very proactive in his pain management. *Id.* He observed Plaintiff to be able to come up on his tiptoes and heels; to back and side bend to 10 degrees; and to forward flex to 80 degrees. *Id.* Plaintiff demonstrated normal and equal reflexes bilaterally. *Id.* Dr. Jacobus renewed Plaintiff's prescriptions, but noted that

he was required to sign a violation form because he had again neglected to bring his prescription bottles to the appointment. *Id.*

Dr. Jacobus observed Plaintiff to have myospasm on December 3, 2012. Tr. at 335. He indicated Plaintiff's urine drug screen was consistent with the prescribed medications and that he was doing satisfactorily. *Id.* He refilled Plaintiff's medications and indicated he would request that Plaintiff's insurance carrier approve a back brace. *Id.*

On March 6, 2013, Plaintiff reported some tingling and numbness, but stated he had improved somewhat and had been up, down, and moving about. Tr. at 363. Dr. Jacobus observed that Plaintiff's ROM had improved and that he had no myospasm. *Id.* He noted that Plaintiff had a lot of bladder complaints with a positive Valealva-type history. *Id.* He stated Plaintiff was making good progress and should continue on a conservative course. *Id.*

Plaintiff followed up with Brant Turner, PA-C ("Mr. Turner"), in Dr. Jacobus's office on April 15, 2013. Tr. at 360. He complained of low back pain, but denied side effects from his medications and stated his sleep was good. *Id.* Mr. Turner refilled Plaintiff's prescriptions and instructed him to use ice for inflammation. Tr. at 361.

On May 22, 2013, Dr. Jacobus noted that Plaintiff showed no abhorrent behavior and was getting up and down and moving about. Tr. at 356. Plaintiff reported pain in his neck, lower back, left knee, and left ankle, but denied side effects from medications. Tr. at 357. Dr. Jacobus observed Plaintiff to have a lot of myospasm; to have pain when standing on his tiptoes and heels; and to have forward flexion to 70 degrees. Tr. at 356.

He stated he would renew Plaintiff's medications and continue conservative treatment. *Id.*

On July 24, 2013, Plaintiff reported no negative side effects from his medications, but continued to endorse pain in his neck, back, hands, and knees. Tr. at 353. Dr. Jacobus noted that Plaintiff's gait was intact and that he did not use mobility aids. Tr. at 354. He referred Plaintiff for an updated EMG study. Tr. at 352.

Plaintiff presented to Jay Patel, M.D. ("Dr. Patel"), for electrodiagnostic testing on July 30, 2013. Tr. at 351. Dr. Patel indicated the EMG showed median neuropathy across Plaintiff's bilateral wrists and was consistent with severe bilateral carpal tunnel syndrome. Tr. at 351.

On August 22, 2013, Dr. Jacobus explained to Plaintiff that the EMG results indicated the carpal tunnel syndrome was more severe on the left than the right. Tr. at 350. Plaintiff stated he would prefer to pursue injections and would only consider surgery as a last resort. *Id.* Dr. Jacobus scheduled for Plaintiff to return in a month for a carpal tunnel injection, but advised him that the injections would only provide temporary relief and that surgery would still be indicated. *Id.*

Plaintiff returned to Dr. Jacobus for a carpal tunnel injection on September 25, 2013. Tr. at 347. He reported increased pain in his back and lower extremities. *Id.* Dr. Jacobus noted that Plaintiff's gait was intact and that he did not use a mobility aid. Tr. at 348.

Plaintiff underwent nerve conduction studies ("NCS") and EMG of his lower extremities on September 30, 2013. Tr. at 372. David S. Rogers, M.D. ("Dr. Rogers"),

13

indicated the EMG was normal, but that the electrophysiologic evidence was "suggestive but not conclusive of left S1 distribution compromise as evidenced by H-reflex symmetry." Tr. at 372.

On November 20, 2013, Plaintiff reported that Gabapentin, Oxycodone, and Tramadol were working well to control his pain. Tr. at 368. He endorsed improvement in his left wrist and expressed a desire to proceed with carpal tunnel injection in his right wrist. *Id.* He reported a significant change in his posture and stated he was having difficulty getting up and down. *Id.* Dr. Jacobus noted that Plaintiff was using a cane. *Id.* He observed Plaintiff to have swollen joint borders, a lot of pain, and reduced ROM with abduction, adduction, and internal and external rotation of his left hip. *Id.* He administered a right carpal tunnel injection and referred Plaintiff for blood work and an MRI of his left hip. *Id.*

Plaintiff followed up with Dr. Jacobus on December 12, 2013, to discuss the results of the MRI of his left hip. Tr. at 367. Dr. Jacobus indicated Plaintiff had mild degenerative changes in his bilateral hips, but no abnormalities. *Id.* He instructed Plaintiff on some exercises and advised him to follow up in a month. *Id.*

On February 20, 2014, Dr. Jacobus prescribed a walking cane. Tr. at 373. He observed that Plaintiff was getting up and down and was proactive. Tr. at 383. He noted Plaintiff "was still even able to work." *Id.* He stated Plaintiff was able to forward flex to 90 degrees and bend on the right and left sides to 20 degrees. *Id.* He indicated Plaintiff had some myospasm in his lumbar region, but had normal patellar, Achilles, and plantar reflexes and no paresthesias or lymphadenopathy. *Id.* Plaintiff complained that Ultram

14

was not providing much relief. *Id.* Dr. Jacobus discontinued Ultram and renewed Plaintiff's prescriptions for Gabapentin and Oxycodone. *Id.*

On March 31, 2014, Plaintiff's EMG results were abnormal and were most consistent with an old left L5 radiculopathy with reinnervation potentials and no acute denervation. Tr. at 381. Dr. Westrol indicated the EMG findings were not impressive when viewed in isolation, but were significant when interpreted with the March 23, 2012 MRI of the lumbar spine and correlated with Plaintiff's complaints. *Id.* He recommended Plaintiff consider additional lumbar ESIs. *Id.*

On April 17, 2014, Plaintiff stated he was doing well and was using his cane less. Tr. at 382. He indicated his back brace had made a significant difference—particularly when he drove or engaged in repetitive activities. *Id.* Dr. Jacobus observed that Plaintiff continued to show radicular changes down the left side. *Id.* He renewed Plaintiff's prescriptions and instructed him to follow up in a month. *Id.*

Plaintiff presented to Carlee Groomes, PA-C ("Ms. Groomes"), on June 26, 2014, for medication refills. Tr. at 400. He reported his medications were working okay, but requested that Oxycodone be reduced from 15 milligrams three times a day to 10 milligrams three times a day. *Id.* He also requested that Ms. Groomes prescribe medication to improve his sleep. *Id.* He endorsed pain in his hands, back, buttocks, hips, legs, and feet. Tr. at 402. Ms. Groomes described Plaintiff as ambulating normally; having an active and alert mental status and a normal mood; demonstrating no edema; and having normal ROM of all extremities. Tr. at 403. She prescribed Ambien and instructed Plaintiff to break his Oxycodone tablets in half and to take them up to six times

per day. Tr. at 404. She stated Plaintiff should consider an ESI consultation for his L5 radiculopathy. *Id.*

On July 24, 2014, Plaintiff reported pain in his hands, back, buttocks, hips, legs, and feet. Tr. at 396. Ms. Groomes observed Plaintiff to be ambulating normally; to have good judgment; to demonstrate an active, alert, and normal mood; to be oriented to time, place, and person; to have no edema; and to have normal musculoskeletal ROM and adequate ROM of all extremities. Tr. at 397. She refilled Plaintiff's medications. Tr. at 399.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on July 28, 2014, Plaintiff testified that he lived in a mobile home with his wife, his 17-year-old daughter, and his 14-year-old son. Tr. at 35.

Plaintiff testified that he last worked in 2009. Tr. at 39. He indicated he received unemployment benefits after being laid off from his job. Tr. at 40. He stated he realized he was unable to perform any work after he exhausted his employment benefits. *Id.* He admitted he had assisted his uncle to build a deck at a rental home in February 2014. Tr. at 41. He stated he had retrieved wood and handed it to his uncle and had held up vinyl siding while his uncle hammered it in place. *Id.* He estimated he worked for two to three hours at a time on three days per week over a two-and-a-half month period. Tr. at 53. He indicated he informed his uncle that he was unable to continue the work because it increased his back pain and the numbness in his hands. Tr. at 41 and 54.

Plaintiff testified that pain in his lower back and left leg were the most significant problems that prevented him from being able to work. Tr. at 42. He indicated his leg pain had resulted from his back injury and denied having sustained a separate injury to his leg. Tr. at 42. He stated he experienced numbness in his left leg when he walked and tried to bend or lift items. Tr. at 48. He indicated he had not pursued back surgery because of problems with Medicaid. Tr. at 59. Plaintiff endorsed carpal tunnel syndrome in both hands that resulted in left hand numbness and difficulty opening jars and buttoning buttons. Tr. at 42, 49, and 56–57. He indicated the injections he had received had only provided relief for a short period. *Id.* He stated he had "a little depression," but that his medications had improved his symptoms. Tr. at 43–44. He indicated his pain medication reduced his pain from an eight to a six on a 10-point scale and helped him to better communicate with his family members. Tr. at 52 and 55. Plaintiff stated an ESI had been ineffective at reducing his back pain. *Id.*

The ALJ observed that Plaintiff was using a cane and asked if it had been prescribed by a physician. Tr. at 38. Plaintiff stated that Dr. Jacobus had prescribed it between May and July of 2013. *Id.* The ALJ pointed out that the prescription for the cane was dated February 20, 2014, and Plaintiff admitted that he was initially using a non-prescribed cane. Tr. at 39.

Plaintiff testified that Valium made him "feel a little bit loopy." Tr. at 44. He stated that a back brace had provided some relief and indicated he typically wore it when he rode in the car for 45 minutes or more. Tr. at 45.

Plaintiff estimated he could lift nothing heavier than a 10-pound bag of potatoes. Tr. at 48. He indicated he was unable to bend to pick up items from the ground. *Id.* He stated he could walk through Walmart for no longer than 20 minutes. Tr. at 49. He testified he could stand for less time than he could walk. Tr. at 50. He indicated he would need to rest for 10 to 15 minutes before he could continue to walk. *Id.*

Plaintiff stated that his driver's license has been suspended in 2000 because of convictions for driving under the influence and that he had been unable to afford to have it reinstated. Tr. at 37. He testified that on a typical morning, he would take his medication, eat breakfast, and sit for a couple of hours. Tr. at 46. He indicated he walked across the street to visit his parents. *Id.* He stated he fed his mother because she trembled and was unable to hold a spoon. Tr. at 54. He indicated he had done yard work in the past, but that his son had assumed that responsibility. Tr. at 55. He testified he was no longer able to work on cars or hunt quail. Tr. at 57–58. He indicated he smoked one to one-and-a-half packs of cigarettes per day. Tr. at 58.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Robert Brabham reviewed the record and testified at the hearing. Tr. at 60–86. The VE categorized Plaintiff's PRW as a die cutter helper as semiskilled and medium per the *Dictionary of Occupational Titles* ("*DOT*"), but light as actually performed; an industrial cleaner as unskilled and heavy; an ingredient handler as unskilled and medium; and a landscape laborer as unskilled and heavy. Tr. at 63–64. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the light exertional level with the following restrictions: only occasional

18

use of the left lower extremity to operate foot controls; able to sit or stand at will while remaining at the workstation; never climbing ladders, ropes, or scaffolds; occasionally climbing ramps and stairs, balancing, stooping, kneeling, and crouching; frequently handling and fingering with the bilateral hands; less than occasional exposure to hazards associated with unprotected, dangerous machinery and unprotected heights; and limited to simple, routine, repetitive tasks in a low stress, predictable work environment, free from fast-paced or team-dependent production requirements, and performed with less than occasional interaction with the general public. Tr. at 65–66. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 66. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified light jobs with a specific vocational preparation ("SVP") of two as a machine tender or operator, *DOT* number 689.685-130, with 10,000 positions in South Carolina and 400,000 positions in the national economy; a production inspector, *DOT* number 739.687-102, with 5,000 positions in South Carolina and 200,000 positions in the national economy; and a laundry worker, *DOT* number 302.685-010, with 2,000 positions in South Carolina and 80,000 positions in the national economy. Tr. at 66–67.

The ALJ then asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited as described in the first question, but to further assume the individual would be limited to standing and walking for four hours in an eight-hour workday. Tr. at 68. The VE testified the individual could perform the jobs as a machine tender or operator and a production inspector, but could not perform the job as a

laundry worker. Tr. at 68–69. He stated the individual could perform a light and unskilled job as an office helper, *DOT* number 239.567-010, with 2,000 positions in South Carolina. Tr. at 70–71.

The ALJ next asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited as described in the first hypothetical question, but to further assume the individual was limited to sedentary work. Tr. at 71. The VE testified the individual could perform sedentary jobs with an SVP of two as a medical products assembler, *DOT* number 739.687-086, with 2,000 positions in South Carolina and 80,000 positions in the national economy and a general hand worker, *DOT* number 589.687-014, with 5,000 positions in South Carolina and 200,000 positions in the national economy. Tr. at 71–72.

The ALJ asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited as described in the previous questions, but to further assume the individual required use of a handheld assistive device to ambulate over narrow, slippery, or erratically-moving surfaces and for ascending and descending slopes. Tr. at 72–73. The VE testified the hypothetical individual could perform the jobs identified in response to the previous hypothetical questions. Tr. at 73–74.

The ALJ asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited as described in the previous questions, but to further assume the individual could never stoop. Tr. at 74. The VE testified that stooping would not be a factor that would affect the jobs identified in response to the previous hypothetical questions. Tr. at 75.

The ALJ asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited as described in the first three questions as modified to allow for only occasional bilateral handling and fingering. *Id.* The VE testified the individual could perform the jobs identified at the light exertional level, but would be unable to perform the jobs identified at the sedentary exertional level. Tr. at 76.

Plaintiff's attorney asked the VE to explain the implication of a limitation to lifting 10 pounds for one-third of a workday. Tr. at 78–79. The VE confirmed that the limitation would preclude work at the light exertional level. Tr. at 79. Plaintiff's attorney asked the VE to assume a hypothetical individual was restricted to occasionally lifting no more than 10 pounds; could do no stooping; could sit for up to six hours in an eight-hour workday; could stand and walk for up to six hours in an eight-hour workday; would have to avoid pushing, pulling, pronation, or twisting of his hands; and could not work on an assembly line or put things together using small tools all day. Tr. at 82–84. The VE indicated the limitations in the hypothetical question would preclude work. Tr. at 84–85.

Plaintiff's attorney asked the VE to further assume the individual's capacity for maintaining concentration, persistence, or pace would be reduced by 20 percent because of pain. Tr. at 85. The VE testified that the individual would not be productive enough to maintain employment. Tr. at 85–86.

2.     The ALJ's Findings

In his decision dated October 30, 2014, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant last met the insured status requirements of the Social Security Act on June 30, 2013.

2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 12, 2012 through his date last insured of June 30, 2013 (20 CFR 404.1571 *et seq.*).

3.  Through the date last insured, the claimant had the following severe impairments: lumbar degenerative disc disease, bilateral carpal tunnel syndrome, and depression (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except standing and walking combined are limited to 4 hours. Further, the claimant's ability to use foot controls on the left is limited to occasional within the exertional level. The claimant can sit or stand at will within the exertional limit while remaining at the workstation. Further, the claimant requires a hand-held assistive device, such as a cane, to ambulate over narrow, slippery, or erratically moving surfaces, or for ascending or descending slopes. The collateral arm can be used to lift and carry up to the exertional limit, except when using stairs; and a hand-held assistive device would not be necessary for standing. The claimant can never climb ladders, ropes, or scaffolds; and he could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. Bilateral handling and fingering are limited to frequent; and the claimant could tolerate less than occasional, if any exposure to hazards associated with unprotected dangerous machinery or unprotected heights. The claimant is able to understand, remember, and carry[]out simple, routine, repetitive tasks in a low stress, predictable work environment that is free of fast-paced or team-dependent production requirements. In addition, the work must be performed with less-than-occasional interaction with the general public.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on April 23, 1966 and was 47 years old, which is defined as a younger individual age 18–49, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the dated [sic] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from January 12, 2012, the alleged onset date, through June 30, 2013, the date last insured (20 CFR 404.1520(g)).

Tr. at 13–24.

D.     Post-Hearing Evidence Submitted to Appeals Council

1.     Dr. Tollison's Evaluation and Opinion

Plaintiff visited C. David Tollison, Ph. D. ("Dr. Tollison"), for a diagnostic evaluation on September 2, 2014. Tr. at 408. He reported symptoms of anxiety and depression that worsened in 2010 or 2011. Tr. at 409. He indicated his inability to control his emotions had caused him to express anger to his wife and children. *Id.* He reported one to three crying episodes per week. *Id.* He stated his energy level was low and that he often felt weak and fatigued. *Id.* He indicated he had gained 15 to 20 pounds over the past two years and attributed his weight gain to his sedentary lifestyle. Tr. at 409–10. He complained of problems with concentration and memory. Tr. at 410.

Dr. Tollison observed that Plaintiff was oriented to time, place, person, and situation; had intact thought processes, but somatic thought content; exhibited a mild intensity of psychomotor agitation; had grossly intact recent and remote memory; demonstrated a blunted affect and an anxious mood; was of average intelligence; was able to recite the days of the week and months of the year in reverse order; was able to mentally calculate a simple subtraction problem; was able to spell "world" forwards and

backwards; and did not demonstrate signs of hallucinations, delusions, or psychotic symptoms. *Id.*

Results of the Pain Patient Profile showed Plaintiff to experience anxiety in the top seventh percentile; to experience depression in the top sixteenth percentile; and to experience somatization in the top twelfth percentile. Tr. at 410–11. Dr. Tollison noted the test results evidenced "an obsessive, worried, nervous, anxious, and insecure individual who likely is experiencing sleep disturbance and memory problems." Tr. at 411. He further indicated "[t]emper and impulse control also may be impaired and he may lash out at others, even over trivial matters, later feeling guilt and remorse." *Id.*

Dr. Tollison deemed results of the Minnesota Multiphasic Personality Inventory to be valid and to show Plaintiff to be "a highly anxious, overly reactive, and clinically depressed individual who reports multiple pain and physical symptoms." *Id.* He stated Plaintiff may occasionally "exhibit symptoms of frustration, irritability, and anger directed toward others" and was "statistically prone to development and influence of multiple psychological symptoms over time." *Id.* He diagnosed major depressive disorder, generalized anxiety disorder, and somatoform disorder and assessed Plaintiff's GAF score to be between 45 and 50.[5] Tr. at 411–12.

Dr. Tollison stated as follows:

It is my opinion Mr. Martin suffered a severe intensity of depression and anxiety prior to June 30, 2013, and this opinion is consistent with the diagnoses and treatments of ReGenesis and the diagnosis made by Dr.

---

[5] A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV-TR.*

Morgan. It is further my opinion that prior to June 30, 2013, Mr. Martin would have been unable to maintain concentration over time due to the distracting nature of pain and psychological symptoms and also unable to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. It is further my opinion that prior to June 30, 2013, Mr. Martin would have been unable to function productively without frequent and unscheduled rest periods and breaks. Subsequent to June 30, 2013, it is my professional opinion that the aforementioned limitations and restrictions continued to apply. In addition, the patient is no longer able to tolerate work pressures, stresses, and demand situations without deterioration both in physical and psychological functioning.

Tr. at 412. He stated Plaintiff's condition was chronic and was expected to continue over the next 12 or more months, but indicated Plaintiff remained capable of managing funds. *Id.*

2.    Dr. Hecker's Vocational Assessment and Opinion

On November 19, 2014, Plaintiff's attorney obtained a sworn statement from Benson Hecker, Ph. D. ("Dr. Hecker"). Tr. at 423. Dr. Hecker stated he was "self-employed as a consultant to State and Federal Agencies in the areas of vocational psychological evaluation" and that he also had his "own practice working directly with people who have a variety of physical and/or emotional problems." Tr. at 424–25. He confirmed that he engaged in "testing, evaluation, training, research and placement of handicapped individuals." Tr. at 425. He explained that his testimony had been accepted by the SSA's Office of Disability Adjudication and Review on thousands of occasions. Tr. at 425–26. Dr. Hecker confirmed that Plaintiff's attorney had provided him with medical exhibits, a copy of the ALJ's decision, and information regarding Plaintiff's age, education, and PRW. Tr. at 428.

Plaintiff's attorney questioned Dr. Hecker about the jobs of assembler and general hand worker that the VE identified in the response to hypothetical questions posed at the hearing. Tr. at 429. Dr. Hecker stated the assembler job was described in the *DOT* as sedentary, but that the general hand worker job was described in the *DOT* as light. *Id.* He denied that the definitions of light and sedentary work in the *DOT* provided for sitting or standing at will. Tr. at 430.

Dr. Hecker indicated he had evaluated Plaintiff's ability on the Purdue Pegboard test, which evaluates an individual's ability to use the bilateral hands "in an assembly type situation in an industrial setting." Tr. at 432. He found Plaintiff to score in the fifth percentile when using only his right hand; below the fifth percentile when using only his left hand; and in the fifty-fifth percentile when using both hands in coordination. *Id.* However, he noted that Plaintiff scored in less than the first percentile when asked to do assembly work. *Id.* He stated Plaintiff's scores were "at the lowest level that we can identify with regard to requirements for successful work or successful use of the extremities." Tr. at 433. He indicated it was his opinion that Plaintiff "would not be able to perform work successfully in an industrial work setting where he had to use his hands for assembly, disassembly, fine or gross motor." *Id.* He further indicated Plaintiff had no fine or gross motor skills. *Id.*

Plaintiff's attorney asked Dr. Hecker to indicate his opinion on Plaintiff's ability to perform the jobs of assembler or general hand worker. Tr. at 433. Dr. Hecker stated Plaintiff would be unable to perform those jobs effectively and would be unable to maintain employment because he could not maintain the standards and quotas required.

Tr. at 434. He indicated fine and gross motor skills would be an integral part of both jobs and that an individual who had any diminution in his capacity to use his hands would be unable to perform the jobs effectively. *Id.* He stated the jobs of assembler and general hand worker required at least frequent use of the hands. *Id.*

Plaintiff's attorney asked Dr. Hecker to assess the impact of Plaintiff being 20 percent slower than an average assembler or general hand worker. Tr. at 435. Dr. Hecker stated Plaintiff would be unable to meet quotas and schedules and, consequently, would be unable to keep a job. *Id.*

Plaintiff's attorney asked Dr. Hecker to assume Plaintiff would have difficulty putting things together using small tools, as indicated by Dr. Jacobus in an earlier statement. Tr. at 436. He asked if Plaintiff could do the jobs of assembler and general hand worker. *Id.* Dr. Hecker stated the limitation would preclude Plaintiff from performing the two jobs. *Id.*

Plaintiff's attorney asked Dr. Hecker to identify any problems that may be caused by a requirement to use a cane in one hand. *Id.* Dr. Hecker stated use of a cane would have no impact on Plaintiff's ability to perform light or sedentary jobs if he only required use of the cane "for ambulation to and from work or to the bathroom or on slippery surfaces, if that is the only use or climbing steps, if that's the only use for that cane." Tr. at 436–37. However, he stated Plaintiff would be unable to perform the identified jobs if he were required to hold the cane in one hand to balance while standing. Tr. at 437.

Plaintiff's attorney asked Dr. Hecker to consider the limitations Dr. Jacobus identified in his June 23, 2014 interview. Tr. at 447. He asked if an individual could

perform the jobs identified in the ALJ's decision with the specified limitations. Tr. at 447–50. Dr. Hecker stated he could perform no jobs. Tr. at 450.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)     the ALJ improperly relied on the VE's testimony; and

2)     the ALJ did not adequately consider the medical opinions of record.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged

in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[6] (4) whether such impairment prevents claimant from performing PRW;[7] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62

---

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[7] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

(1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

## 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v.*

*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Reliance on VE Testimony

The ALJ found that Plaintiff had the RFC to perform light work that required no more than four hours of sitting, standing, and walking; occasional use of foot controls with the left lower extremity; sitting, standing, and walking at will within the exertional limit while remaining at the work station; use of a hand-held assistive device to ambulate over narrow, slippery, or erratically-moving surfaces and for ascending or descending slopes; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, and crouching; no more than frequent bilateral handling and fingering; less than occasional exposure to hazards associated with unprotected dangerous machinery and unprotected heights; understanding, remembering,

and carrying out simple, routine, repetitive tasks; a low-stress, predictable work environment that was free of fast-paced or team-dependent production requirements; and less than occasional interaction with the general public. Tr. at 15. He relied on the VE's testimony to find that the limitations specified in the RFC assessment would allow for the performance of jobs as an assembler, *DOT* number 739.687-086, and a general hand worker, *DOT* number 589.687-014. Tr. at 23. The ALJ determined the VE's testimony was consistent with the information contained in the *DOT*. Tr. at 24.

Plaintiff argues the ALJ erred in relying on the VE's assertion that his testimony did not conflict with the *DOT*. [ECF No. 10 at 23–24]. He maintains that the *DOT* and *Selected Characteristics of Occupations* ("*SCO*") indicate that an individual with the limitations specified in the assessed RFC could not perform the jobs the VE identified. *Id.* at 24–25. He explains that the *SCO* describes the jobs as requiring constant handling, but that the ALJ restricted him to frequent handling in the assessed RFC. *Id.* at 25.

The Commissioner argues that the VE specified that frequent, as opposed to constant, handling was required in the specific jobs he identified. [ECF No. 12 at 7]. She maintains that the ALJ acknowledged in his decision that the *DOT* was silent on some issues, but that he was satisfied that the VE based his testimony on the provisions of SSR 00-4p and that his explanation was reasonable and reliable based on his education, professional knowledge, and research. *Id.* at 8. She maintains that SSR 00-4p recognizes that occupations described in the *DOT* represent numerous jobs and that VEs may be able to provide more specific information about individual jobs than the *DOT*. *Id.*

At the fifth step in the sequential evaluation process, "the Commissioner bears the burden to prove that the claimant is able to perform alternative work." *Pearson v. Colvin*, 810 F.3d 204, 407 (4th Cir. 2015), citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). In assessing the claimant's ability to perform other jobs existing in significant numbers in the national economy, the ALJ should take administrative notice of job information contained in the *DOT*.  20 C.F.R. § 404.1566(d); *see also* SSR 00-4p (providing that "we rely primarily on the *DOT* (including its companion publication, the *SCO*) for information about the requirements of work in the national economy"). In some cases, ALJ call upon the services of VEs to address how certain restrictions affect claimants' abilities to perform specific jobs.  20 C.F.R. § 404.1566(e).

Recognizing that VE's opinions sometimes conflict with the information contained in the *DOT*, the SSA promulgated SSR 00-4p to explain how these conflicts should be resolved. The Fourth Circuit recently explained that the "purpose" of SSR 00-4p "is to require the *ALJ* (not the vocational expert) to '[i]dentify and obtain a reasonable explanation' for conflicts between the vocational expert's testimony and the *Dictionary*, and to '[e]xplain in the determination or decision how any conflict that has been identified was resolved.'" *Pearson*, 810 F.3d at 208, citing SSR 00-4p (emphasis in original). The court noted that SSR 00-4p sets forth two independent responsibilities. *Id.* "First, the ALJ must '[a]sk the [vocational expert] . . . if the evidence he or she has provided conflicts with the information provided in the [*Dictionary*]'; the ALJ must 'obtain a reasonable explanation for the apparent conflict.'" *Id.*, citing SSR 00-4p. Second, "SSR 00-4p directs the ALJ to 'resolve the conflict by determining if the

explanation given by the [expert] is reasonable'" and "to 'explain the resolution of the conflict *irrespective of how the conflict was identified*.'" *Id.*, citing SSR 00-4p (emphasis in original). Thus, "[t]he ALJ independently must identify conflicts between the expert's testimony and the *Dictionary*." *Id.* at 209.

The court clarified that the "apparent" conflicts that ALJs must identify are those "where the expert's testimony seems to, but does not necessarily, conflict with the *Dictionary*." *Id.* at 209. It further explained that "[t]he 'apparent' conflict standard" "embraces the reality that, in many cases, testimony may only *appear* to conflict with the *Dictionary*, and the vocational expert may be able to explain that, in fact, no conflict exists." *Id.* at 209 (emphasis in original). Nevertheless, the court stated that "if the ALJ does not elicit this explanation, then the expert's testimony cannot provide substantial evidence to support the ALJ's decision." *Id.* at 209. It stated "[a]n expert's testimony that apparently conflicts with the *Dictionary* can only provide substantial evidence if the ALJ has received this explanation from the expert and determined that the explanation is reasonable and provides a basis for relying on the testimony rather than the *Dictionary*." *Id.* at 209–10, citing SSR 00-4p. An ALJ "has a duty to investigate the facts and develop the record independent of the claimant or his counsel" and has "not fully developed the record if it contains an unresolved conflict between the expert's testimony and the *Dictionary*." *Id.* at 210. "Nor has the ALJ fulfilled this duty if he ignores an apparent conflict because the expert testified that no conflict existed." *Id.* at 210.

The undersigned's review of *DOT* number 739.687-086 includes the following with respect to "Handling" and "Fingering": "Constantly–Exists 2/3 or more of the time."

739.687-086 EYE-DROPPER ASSEMBLER. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 680194. *DOT* number 589.687-014 indicates "Handling" to be required "Constantly–Exists 2/3 or more of the time." 589.687-014 CLOTH FOLDER, HAND. *Dictionary of Occupational Titles* (4th ed., Revised 1991), 1991 WL 684519. As used in the *DOT*, "frequently" means that an "activity or condition exists from 1/3 to 2/3 of the time" and "constantly" means an "activity or condition exists 2/3 or more of the time." APPENDIX C–COMPONENTS OF THE DEFINITION TRAILER, *Dictionary of Occupational Titles* (4th ed., Revised 1991), 1991 WL 688702. Thus, the VE's identification of jobs that required constant handling and fingering conflicted with the ALJ's limitation to frequent bilateral handling and fingering in the hypothetical he posed and RFC he assessed.

The ALJ explicitly requested that the VE inform him of and provide the basis for any opinion that conflicted with the information in the *DOT*. Tr. at 61. The following exchange between the ALJ and the VE indicates the VE specifically considered the restriction to frequent handling and fingering:

VE: And we can still handle frequently in this hypothetical?

ALJ: Right, do you want me to repeat any of those at all.

VE: No, sir.

ALJ: That's the only change, we're just changing the exertional level now.

VE: The hypothetical, again, jobs that we have talked about, and with the ability to continue to use the handling on a frequent basis, I think we could continue to consider a number of jobs that would be defined. In the category, for example of assemblers, this is not constant [INAUDIBLE]. It is just what you said, frequent use of the hands.

> There are about 2,000 sedentary assemblers of very small items, very small objects by definition, medical products and that sort of thing. A representative code of the 2,000 in South Carolina equates to about 80,000 in the national economy. A DOT is representative in wide parts of the country would include some medical products, 739.687-086. The hypothetical would also meet consideration of some of the just general hand workers. There are about 5,000 of those that are sedentary. Again, this is not constant but occasional as your hypothetical—frequent as your hypothetical permits. The 5,000 of these jobs in South Carolina equates to about 200,000 in the national economy. Representative code in this regard, your honor, would include 589.687-014, it's 2, it's sedentary. Your hypothetical permits, sir. That's three.

Tr. at 71–72. This exchange does not show that the VE acknowledged that a conflict existed between the jobs he identified and their descriptions in the *DOT* or explained why his opinion differed from the *DOT*'s description of the jobs.

In *Pearson*, 810 F.3d at 209, the court emphasized that an ALJ has an affirmative duty to identify and resolve conflicts between the *DOT* and the VE's testimony. Here, the ALJ recognized that there may be some conflict between the VE's testimony and the *DOT*, but he focused only on the *DOT*'s silence with respect to the sit/stand option and use of a cane and found that the VE's testimony filled the gaps. *See* Tr. at 24. He did not acknowledge the conflict between the *DOT*'s description of the jobs as requiring constant handling and fingering and the VE's testimony that they could be performed if handling and fingering were limited to frequent. Therefore, the ALJ neglected his duty to identify conflicts between the VE's testimony and the *DOT*.

The Commissioner argues that the ALJ's failure to identify the conflicts was harmless because the ALJ stated he was "satisfied that the vocational expert offered his opinion based on the provisions of Social Security Ruling 00-04p" and that his

explanation for his testimony was "reasonable and reliable, based on his education, professional knowledge and research with respect to the demands of those occupations." ECF No. 12 at 8, citing Tr. at 24. The undersigned rejects this argument for a couple of reasons. First, in accepting the VE's opinion regarding the sit/stand option and use of a cane, the ALJ specified that the VE's testimony did not "contradict the Dictionary, but rather fills gaps in its information." Tr. at 24. Thus, the ALJ explicitly stated that no conflict existed between the *DOT*'s description of the job and the VE's testimony because the *DOT* was silent as to the sit/stand option and use of a cane. *See id.* Here, the *DOT* is not silent and there is a conflict between the limitation to frequent handling and fingering and the *DOT*'s descriptions of the jobs the VE identified in his testimony. Second, the ALJ's acceptance of the VE's education, professional knowledge, and research to fill a void in the *DOT*'s description cannot serve as a catchall for every potential conflict between the VE's testimony and the *DOT*. *Pearson*, 810 F.3d at 209, indicates that the ALJ must elicit testimony from the VE regarding the particular conflict in order to rely on the VE's testimony as substantial evidence. Here, the ALJ obtained no testimony from the VE regarding this conflict.

Because the ALJ failed to identify and reconcile the conflict between the limitations specified in the RFC and the *DOT*'s description of the jobs the VE identified, he did not meet his burden at step five to show that there were other jobs that existed in the economy that Plaintiff could perform.

2.    Evaluation of Medical Opinions

Plaintiff argues the ALJ failed to properly consider the medical opinions of record. [ECF No. 10 at 26–32]. The Commissioner maintains that the ALJ appropriately weighed the opinion evidence. [ECF No. 12 at 9–12].

Treating physicians' opinions are entitled to deference and may be entitled to controlling weight if they are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence of record. *Morgan v. Barnhart*, 142 F. App'x 716, 727 (4th Cir. 2005); 20 C.F.R. § 404.1527(c)(2). An ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. Opinions from treating medical sources generally carry more weight than other opinion evidence of record, even if they are not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or are inconsistent with other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2). Nevertheless, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).

If the ALJ does not accord controlling weight to a treating physician's opinion, he must weigh all medical opinions of record based on (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the

claimant and the medical provider, including the length of the treatment relationship and the frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

It is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

In view of the foregoing authority, the undersigned considers Plaintiff's specific allegations of error.

### a.    Dr. Jacobus's Opinion

In a transcribed interview with Plaintiff's attorney that was conducted on July 9, 2014, Dr. Jacobus stated he first examined Plaintiff on February 8, 2012, and last saw him on April 17, 2014. Tr. at 384. He described Plaintiff as having "a lot of spasticity in his back" and demonstrating signs of L5 radiculopathy. *Id.* He stated that the diagnosis of L5 radiculopathy was confirmed by nerve conduction studies on May 8, 2012. *Id.* He indicated a March 2012 MRI showed an L4-5 disc herniation and a ruptured disc that extended into the left L5 area. Tr. at 385. He described Plaintiff's limitations that resulted from his back impairment as follows:

> He needs to avoid repetitive pushing, pulling, and lifting. He needs to be able to change positions at least every two hours. He must avoid unlevel grass, gravel, stairs, inclines, and scaffolds. Bending, stooping, lifting is not going to be well tolerated. He needs to limit his activities so that through the day he can sit, get up, and maneuver. I don't think he is going to be able to walk distances for a long period of time because it is going to irritate his back.

Tr. at 386. Dr. Jacobus indicated Plaintiff would be unable to lift 20 pounds "repetitiously" or for up to one-third of a day. *Id.* He stated Plaintiff "may be able to lift 10 [pounds] for 1/3 of a day." *Id.* He indicated Plaintiff would be unable to engage in stooping, as defined as "bending at the waist." *Id.* Dr. Jacobus confirmed that Plaintiff had been diagnosed with carpal tunnel syndrome, but that surgery was not indicated at the time. Tr. at 386–87. He stated that Plaintiff would be compromised in his ability to frequently move his index finger, middle finger, and thumb. Tr. at 387. He indicated Plaintiff should avoid pushing, pulling, pronation, and twisting his hand, as if opening a doorknob. *Id.* He stated that repetitive activities such as handling objects for long periods, working on an assembly line, and putting things together using small tools would exacerbate the pain in Plaintiff's low back and upper and lower extremities. *Id.* He reported that Plaintiff's pain would interfere with concentration, work pace, and persistence for an eight-hour workday and five day workweek. *Id.* Finally, he confirmed that he would be willing to answer questions posed by the Social Security Administration ("SSA"). *Id.*

Plaintiff argues the ALJ did not adequately consider his treating physician's opinion. [ECF No. 10 at 26]. He maintains that Dr. Jacobus specified that he had work-

preclusive limitations. *Id.* at 26–27. He contends the ALJ did not provide valid reasons for rejecting portions of Dr. Jacobus's opinion. *Id.* at 27–29.

The Commissioner argues the ALJ did not err in giving greater weight to Dr. Jacobus's opinion that Plaintiff was able to work than to his medical source statement, which included work-preclusive restrictions. [ECF No. 12 at 9–10]. She maintains the opinion that Plaintiff could work was consistent with Dr. Jacobus's examination findings and Plaintiff's statements to Dr. Jacobus. *Id.*

The ALJ indicated he gave "significant weight" to Dr. Jacobus's opinion that Plaintiff "was able to work (Ex. 14F)," because it was "consistent with the claimant's statements that he was able to help his uncle with home modifications; the claimant's ability to perform his activities of daily living independently; and the objective evidence, which shows normal range of motion and a normal EMG of the lower extremities." Tr. at 21–22.

The ALJ gave "partial weight" to Dr. Jacobus's July 23, 2014 opinion because "these statements were reportedly made during an attorney guided and structured interview conducted solely for the purpose of litigation." Tr. at 22. He stated this opinion was "inconsistent with his opinion in Exhibit 14F that the claimant was able to work." *Id.* However, he further indicated he accorded "controlling weight" to the opinion "to the extent supported by the medical evidence." *Id.*

The ALJ's citation of a conflict between Dr. Jacobus's February 2014 notation that Plaintiff was able to work (Tr. at 383) and his July 2014 opinion that included work-preclusive limitations (Tr. at 384–88) was sufficient to support his decision not to accord

41

controlling weight to the July 2014 opinion. *See* 20 C.F.R. § 404.1527(c)(2) (stating that the treating physician's opinion should be accorded controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record). However, an ALJ cannot dismiss a treating physician's opinion simply because it is not entitled to controlling weight. *See* SSR 96-2p ("A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator."). He must evaluate all of the opinions, including that of the treating physician, based on the factors in 20 C.F.R. § 404.1527(c).

Although the ALJ purported to have considered all the medical opinions based on the factors in 20 C.F.R. § 404.1527(c) (Tr. at 21), a review of his decision does not reflect that he evaluated Dr. Jacobus's July 2014 opinion in light of the relevant factors. The ALJ referenced some of Plaintiff's treatment visits, but he did not credit Dr. Jacobus as Plaintiff's treating physician. *See* Tr. at 17–20 (noting Plaintiff's complaints and examination findings on February 8, 2012, March 8, 2012, June 6, 2012, August 2, 2012, October 3, 2012, November 1, 2012, March 6, 2013, November 20, 2013, February 20, 2014, and April 17, 2014). His decision reflects no contemplation of the length of the treatment relationship, the frequency of examination, or the nature and extent of the treatment relationship. *See* 20 C.F.R. § 404.1527(c)(2)(i), (ii). The ALJ failed to weigh Dr. Jacobus's July 2014 opinion in light of his explanation that linked his clinical observations and objective testing with the diagnoses and limitations he assessed. *See* Tr.

42

at 384–85; *see also* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."). While the ALJ accorded "controlling weight" to the opinion "to the extent supported by the medical evidence" (Tr. at 22), he did not specify the provisions of Dr. Jacobus's opinion that he found to be supported and unsupported by the evidence as a whole. Thus, his consideration of the consistency factors was deficient. *See* 20 C.F.R. § 404.1527(c)(4). The ALJ neglected to consider Dr. Jacobus's specialization as a certified orthopedic surgeon (Tr. at 389) and pain management physician (Tr. at 384 and 394). *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Therefore, the ALJ did not adequately consider Dr. Jacobus's opinion in accordance with the provisions 20 C.F.R. § 404.1527(c).

Because the ALJ's decision to accord partial weight to Dr. Jacobus's July 2014 opinion was not otherwise supported by substantial evidence, it could not be sustained by the fact that it was secured by Plaintiff's attorney for the purpose of litigation. This court has previously declined to "foreclose the possibility that whether a medical opinion is procured by attorney referral may sometimes be a factor in the weight given to that opinion," but has noted "that fact alone is insufficient to establish substantial evidence for discounting the [] opinion." *Jordan v. Colvin*, No. 8:12-1676-DCN, 2013 WL 5317334, at *7 (D.S.C. Sept. 20, 2013), citing *Hinton v. Massanari*, 13 F. App'x 819, 824 (10th Cir. 2001) (holding that an ALJ may "question a doctor's credibility" when the opinion

was solicited by counsel but "may not automatically reject the opinion for that reason alone").

In light of the foregoing, the undersigned recommends the court find the ALJ did not adequately evaluate Dr. Jacobus's opinion.

b.    Dr. Morton's Opinion

Plaintiff argues the ALJ did not properly consider the work-preclusive limitations that Dr. Morton indicated in his report. [ECF No. 10 at 30]. He contends that Dr. Morton's opinion was supported by the record and that the ALJ did not offer valid reasons for rejecting it. *Id.* at 31–32.

The Commissioner argues the ALJ considered the limitations Dr. Morton provided, but found that they were not clearly defined and were unsupported by the evidence of record and his examination findings. [ECF No. 12 at 11]. She maintains the ALJ considered Dr. Morton's opinion in finding that Plaintiff was limited to no more than simple, routine, repetitive tasks in a low stress, predictable work environment that was free of fast-paced or team-dependent production requirements and that must be performed with less than occasional interaction with the general public. *Id.* at 11–12.

The ALJ gave partial weight to Dr. Morton's opinion "because his statement that the claimant would have 'difficulty maintaining pace of work' is not clearly defined'" and because "the opinion that the claimant would 'likely have poor relationships with coworkers and the public' is likewise undefined and unsupported by the medical evidence aside from the claimant's reports of being nervous in social situations." Tr. at 22. He further stated "there is no evidence that the claimant was either discharged or has left

44

employment due to an inability to get along with co-workers." *Id.* Earlier in his decision, the ALJ noted that Plaintiff reported to Dr. Morton that he was able to manage hygiene and self-care; was capable of preparing food; and was able to do light chores. Tr. at 14. He also noted that Dr. Morton observed Plaintiff to display a normal range of affect and to have intact short- and long-term memory. Tr. at 20. He noted that Plaintiff told Dr. Morton that his last job ended "because he was laid off, not because of his impairments." *Id.* He acknowledged that "Dr. Morton noted the claimant was experiencing 'fairly severe' symptoms of depression; and he had low energy, he was irritable, and he [w]as emotionally volatile." *Id.* However, he stated "[n]evertheless, Dr. Morton noted the claimant had not participated in significant mental health treatment." Tr. at 20–21. He further indicated Plaintiff's ADL's were inconsistent with his allegations. Tr. at 21.

Based on the foregoing explanation, it appears the ALJ adequately evaluated Dr. Morton's statement in light of the relevant factors in 20 C.F.R. § 404.1527(c). His decision shows he considered the examining relationship, the supportability of Dr. Morton's opinion in his examination report, the consistency between Dr. Morton's opinion and the record as a whole, and Dr. Morton's status as a psychological consultative examiner. *See* Tr. at 14, 20–21 and 22. Nevertheless, the record contains an additional record from Dr. Tollison that arguably supports Dr. Morton's opinion, but that was not reviewed by the ALJ. *See* Tr. at 408–12; see also Tr. at 4 (incorporating Dr. Tollison's record into the Appeals Council's exhibits list). In light of this additional evidence and the undersigned's recommendation that the case be remanded on other grounds, it would be appropriate for the ALJ to reevaluate Dr. Morton's opinion.

45

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

January 20, 2017                          Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).